People of Puerto Rico, Plaintiff and Appellee, *v.* Antonio Pacheco Padró and Manuel de Catalán, Defendants and Appellants.

No. 8384.  Argued May 1, 1941.—Decided May 27, 1941.

F. M. Susoni, Jr., for appellants. George A. Malcolm, Attorney General, R. A. Gómez, Prosecuting Attorney and Luis Negrón Fernández, Assistant Prosecuting Attorney, for The People, appellee.

MR. JUSTICE TODD, JR., delivered the opinion of the Court.

By stipulation of the parties these two cases were heard jointly in the District Court of San Juan and on appeal have been prosecuted as one sole case. They originated separately in the Municipal Court of San Juan, by virtue of two complaints, one of them against Antonio Pacheco Padró for violation of Section 243 of the Penal Code, said complaint reading as follows:

"In the Municipal Court of the Municipal Judicial District of San Juan, P. R., First Section.—People of Puerto Rico v. Antonio Pacheco Padró.—Criminal No. 10,919. Concerning: Libel.—Complaint. I, Rafael Martínez Nadal, a resident of Guaynabo, Puerto Rico and President of the Senate of this Island, file a complaint against Antonio Pacheco Padró for an offense of libel, (a violation of Section 243 of the Penal Code), committed as follows: in the month of August, 1938, and in the City of San Juan, Puerto Rico, which is included in the Municipal Judicial District of the same name, the defendant wrote and published in the newspaper called 'Florete' which is published every Saturday in San Juan Puerto Rico, an article which circulated publicly in said paper throughout the City, and among other copies, in the copy marked No. 402 (edition of August 20, 1938), said article reading as follows: 'Martínez Nadal defends stubbornly the electric power monopoly. As time goes on we are getting to know better the many native sons who are enemies of Puerto Rico. We are gradually seeing the urgent need of our country for an effective political house-cleaning so that Puerto Rico may have in its government honest and loyal men, and not unscrupulous money changers. The evil of the colonial system is precisely that it permits and protects corruption and laxity to a great extent. The colony ends by sucking its best men, by swallowing them and finally making puppets of them. Ley us see for example, the situation in which Mr. Rafael Martínez Nadal, President of the Senate and of the Union

Republican party, has placed himself. Martínez Nadal has had for a long time the confidence of his people, who have appreciated him without partisan differences. He was well thought of by the people in general. His personality at least, earned him the esteem of his people. But for some time now, Martínez Nadal has become one more unscrupulous politician, completely lacking in principles. He does not believe in them nor does he live in accordance with them. How can it be explained that Martínez Nadal should now appear as the defender of the Puerto Rico Railway Light & Power Company? What wonderful electric wire has been connected to the person of Martínez Nadal? When in the Senate Martínez Nadal is a lawyer and when in the courts, Martínez Nadal is the President of the Senate. A pretty manner has Don Rafa of serving his country, betraying the trust placed in him by all Puerto Rican organizations! Martínez Nadal opposes the New Deal in order to defend the interests of the electric power octopus, which is exploiting thousand· of Puerto Rican families through its high rates. Martínez Nadal knows that in our country the cheapening of electric power is essential for our economics, for our agriculture, for our ˙commerce and for our industry. And in spite of this, Martínez Nadal dares to defend the private power companies from his high position as President of the Senate. What will be the limit of Martínez Nadal's complete surrender to the electric power monopoly interests? Does Martínez Nadal think that the country does not know what is going on underneath, on top or behind the desks in the Senate? Why does Martínez Nadal betray Puerto Rico, placing himself at the service of the electric power.monopoly? Why does Martínez Nadal resist the public demand of Puerto Rico that the electric power be placed in the hands of the people? What benefit does Martínez Nadal derive from that torrent of Puerto Rican gold which leaves us every year bound for Canada? The people demand more honesty, more political decency, more loyalty to Puerto Rico, from Martínez Nadal and from the group which is opposing in both Houses, the legislation which has as its purpose the liberation of Puerto Rico from the electric power monopoly which is smothering it. Will Martínez Nadal at last understand this?' The defendant, who is at present assistant editor of the newspaper called 'Florete' is the sole author of the article copied in this complaint and had the same published with the malicious intent of discrediting the President of the Senate of Puerto Rico, the complainant in this case, and of impeaching his honesty and integrity as President of the Senate of Puerto Rico, thereby exposing

him to public hatred and ridicule with full knowledge that the charges which he made are false and malicious. A fact contrary to law.''

And the other complaint against Manuel de Catalán for a violation of Section 253 of the Penal Code, reads as follows:

''In the Municipal Court of the Municipal Judical District of San Juan, Puerto Rico. First Section. People of Puerto Rico v. Manuel de Catalán. Criminal No. 10,939. Concerning: Violation of Section 253 of the Penal Code. Complaint. I, Rafael Martínez Nadal, a resident of Guaynabo, Puerto Rico, and President of the Senate of this Island, file a complaint against Manuel de Catalán for a violation of Section 253 of the Penal Code (publication of portraits and caricatures) committed as follows: In the month of August, 1938 and in the City of San Juan, Puerto Rico, which is included in the Municipal Judicial District of the same name, the defendant Manuel de Catalán drew and published in the newspaper 'Florete', which is published every Saturday in San Juan, Puerto Rico, a caricature of the complainant which circulated publicly in said newspaper throughout the City of San Juan, and among other copies, in the one marked No. 402, edition of August 20, 1938, said caricature painting the complainant in the following light: Under the title 'In the Senate', the complainant appears in his character of President of the Senate seated in the President's chair with a gavel in his hand and connected to said chair of the President of the Senate of Puerto Rico there appear two electric switches joined to the rear legs of the chair, one expressing that it is the Mayagüez Light and the other expressing that it is the Puerto Rico Railway Light, which two companies supply said chair and through it, the President of the Senate, with electric current, the following phrases being set forth at the end of the caricature: 'THE TWO POWERFUL REASONS WHICH ARE CAUSING THE SABOTAGE'. The defendant, Manuel de Catalán, who works as the caricaturist of said weekly newspaper is the sole author of the caricature and drew it with the malicious intent of attacking the complainant in his probity, honesty, virtue, good repute and political motives, tending to expose him to the public hatred, ridicule and contempt, with full knowledge that said caricature simbolizes false and malicious acts. A fact contrary to law.''

Both defendants were convicted in the municipal court and after the cases had been tried de novo on appeal, they

were also found guilty and sentenced to six months in jail each. They appealed from said judgments to this Court and assign the commission of three errors by the lower court, when it held, first, that the district attorney did not have to prove the malice of the defendant, since this case was an exception to the rule, second, that the defendants, in their character of journalists had committed libel when they published and circulated the article and caricature, and, third, that the defendants did not prove the truth of each and every point of the libelous article.

With respect to the first error, let us study the provisions of the Sections of the Penal Code which it is alleged have been violated. Sections 243, applicable to the case of Antonio Pacheco Padró provides the following:

"A libel is a malicious defamation, expressed either by writing, printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue, or reputation, or publish the natural or alleged defects of one who is alive, and thereby to expose him to public hatred, contempt or ridicule."

And with respect to the case of the other defendant Catalán, Section 253 reads thus:

". . . . It shall likewise be unlawful to publish in any newspaper, handbill, poster, book or serial publication or supplement thereto, any *caricature* of any person residing in Puerto Riro, which caricature will in any manner reflect upon the honor, integrity, manhood, virtue, reputation, or business or political motives of the person so caricatured, or which tends to expose the individual so caricatured to public hatred, ridicule or contempt." (Italics supplied.)

In order to uphold the first assignment, appellants rely on Section 249 of the same Code, which provides:

"No reporter, editor, or proprietor of any newspaper is liable to any prosecution for a fair and true report of any judicial, legislative or other public official proceedings, or of any statement, speech, argument, or debate in the course of the same, except upon proof of malice in making such report, which shall not be implied from the mere fact of publication."

The impression gathered from the mere reading of this last section is that it establishes a privilege in harmony with the freedom of the press guaranteed by our Organic Act in favor of those journalists who publish a "fair and true report of any judicial, *legislative* or other public official proceedings, or of any statement, speech, argument or debate in the course of the same", the result of which is that when this report is exact and impartial, proof of malice in making said report must be required before the court can decide that an offense has been committed. ■ The construction of the privilege must be strict, since the provisions of Section 249 are limited by those of Section 250 of the Penal Code, which reads as follows:

"Libelous remarks or comments connected with matter privileged by the preceding section receive no privilege by reason of their being so connected."

In other words, an exact, just and impartial report of the legislative acts of the complainant, Mr. Martínez Nadal, or of any other legislator, could never be considered libelous *per se,* and since its publication would not be considered malicious, the district attorney would have to prove the existence of malice. But once the report fails to be exact and impartial, and furthermore, is not a report at all but instead an article commenting the attitude which, according to the author, the complainant has assumed with respect to a pending bill or legislation already approved, and couched in an insulting and defamatory language, the privilege ceases, and the publication is presumed to have been malicious, according to Section 245 of the Penal Code, which provides:

"An injurious publication is presumed to have been malicious if no justifiable motive for making it is shown."

Section 249 of our Code, equivalent to Section 254 of the Penal Code of California, has its fountainhead in the Common Law of England. In 1799 it was held by the Court of King's bench, in the case of *Rex* v. *Wright,* 8 T.R. 293, 101 Eng.

Reprint 1396, that the publication of a report of the proceedings had in the House of Commons does not constitute libel, even though it cast shadows upon an individual. Mr. Justice Lawrence said in that famous case:

"Though the publication of such proceedings may be to the disadvantage of the particular individual concerned, yet it is of vast importance to the public that the proceedings of Courts of Justice should be universally known . . . The same reasons also apply to the proceedings in Parliament: it is of advantage to the public, and even to the legislative bodies, *that true accounts of their proceedings should be generally circulated;* and they would be deprived of that advantage if no person could publish their proceedings without being punished as a libeller."

See the annotation reported in 19 A.L.R. 1470, 1499, on Libel and Slander.

In California it has been held that an article, which after reporting a perjury trial, stated that the defendant was the victim rather than the culprit and that he had been the instrument of others, is not protected by the privilege granted by the statute to a *"fair and true report of judicial proceedings." Lyon* v. *Fairweather et al.,* 218 Pac. 477. The court said in its opinion, at page 479:

"The publication which the statute designates as privileged is a fair and true report of the facts; *the statute does not include as privileged facts outside of the record or comments by the writer.* If the article in question had left out the last four paragraphs, it would then have come within the privilege as defined in the statute, but one needs only to read the last four paragraphs to note at once that said paragraphs *are matters of comment and do not purport to state any fact or facts developed in the judicial proceeding which the article purports to report."* (Italics supplied.)

In the case of *Pfister* v. *Sentinel Co.,* 108 Wis. 572, 84 N.W. 887, the Supreme Court of Wisconsin held that:

"Publication that plaintiffs and another by means of their wealth and political power had obtained absolute control of the mayor and a majority of the city council in the matter of obtaining a franchise for the street railway, and that plaintiff by such buying had

in no wise lost caste but continued to be a leader in society, was not privileged as the report of a public official proceeding, since the substance of the publication consisted of the *conclusions and deductions of the writer."* (Italics supplied.)

In 36 C.J. page 1273, paragraph 264, the commentator recognizes the existence of this limitation on the privilege that no editor or reporter shall be prosecuted for reporting judicial or legislative acts, saying:

"The publication must contain only that which happened in the due course of the proceedings, *and any matter added thereto by the publisher defamatory of plaintiff is not priviledged, although the publication is made in good faith, or with reasonable cause to believe it to be true . . ."* (Italics supplied.)

The question is not new in this jurisdiction and was decided adversely to the appellant's theory, in the case of *People* v. *Sierra,* 48 P.R.R. 254, 261–262, where the following doctrine was established:

"As the appellant has very well pointed out in his brief, the publication comprises two parts, one of which is stated to be a report of what happened at the hearing of an appeal before this Supreme Court, and the other which consists of the comments of the reporter.

"With respect to such comments, the Penal Code itself, in section 250, provides: 'Libelous remarks or comments with matter privileged by the preceding section receive no privilege by reason of their being so connected.'

"Upon examination of the evidence offered by the defendant, it is found that in fact many of the questions which it is said in the publication were raised by Attorney Coll y Cuchí find support in the testimony of that same attorney and in the testimony of the witnesses Caro and Rossy. Some do not. If we were dealing with only that part of the publication, we would be inclined to reverse the judgments appealed from, basing ourselves upon a liberal interpretation of the provisions of section 249 of the Penal Code.

"But there is more, the publisher goes further and in the title and in the beginning of the article and in the final paragraphs thereof, makes statements charging Messrs. Guerra, Rodríguez Serra and Del Valle with the commission of acts which, if true, would show their lack of honesty and virtue. And what basis does he have for mak-

ing such statement? Only the oral argument of the attorney for one of the parties in a contested case submitted for decision to a court of justice. Such basis, without more, is not sufficient. *To publish as true accusations so serious upon that sole basis, is not justified. The presumption of malice is in force and the offense must be understood to have been committed. The liberty of the spoken and written word does not suffer by reaching that conclusion. Only the responsibility is demanded which every human action carries with it.*" (Italics supplied.)

After reading and examining carefully the article published by the defendant Antonio Pacheco Padró, it cannot be maintained that he is protected by any privilege. It is not a report of any legislative proceeding, but instead an article in which the author comments from his point of view the attitude of Mr. Martínez Nadal with respect to certain hydroelectric legislation. A mere citation of some of its paragraphs will serve to emphasize even more than if the article as a whole were read, the seriousness of the charges which it makes. Let us see:

"But for some time now, Martínez Nadal has become one more unscrupulous politician, completely lacking in principles. He does not believe in them nor does he live in accordance with them. How can it be explained that Martínez Nadal should now appear as the defender of the Puerto Rico Railway Light & Power Company? *What wonderful electric wire has been connected to the person of Martínez Nadal?* . . . What will be the limit of Martínez Nadal's complete *surrender to the electric power monopoly interests?* Does Martínez Nadal think that the country does not know *what is going on underneath, on top or behind the desks in the Senate?* . . . *What benefit does Martínez Nadal derive from that torrent of Puerto Rican gold which leaves us every year bound for Canada?* The people demand more honesty, more political decency, more loyalty to Puerto Rico from Martínez Nadal . . . Will Martínez Nadal at last understand this?" (Italics supplied.)

The fact that it is phrased as a question and not as an affirmative statement does not favor the defendant at all, nor does it mitigate the defamatory character of the words therein used. The author, when he asks the last two ques-

tions and immediately after remarks "the people demand more honesty, more political decency, more loyalty to Puerto Rico from Martínez Nadal" is clearly charging Mr. Martínez Nadal with lack of honesty, due to the fact that he has been receiving benefits from the torrent of Puerto Rican gold which leaves the Island each year bound for Canada. The charge which the author of the article makes is serious and malicious *per se*. It cannot be in truth maintained that it is protected by any privilege.

■ With respect to the caricature which was published in the same issue of *Florete* as the article, after reading the article and especially the question therein asked: "What wonderful electric wire has been connected to the person of Martínez Nadal?", and seeing in the caricature the figure of the complainant seated in the President's chair with a gavel in hand, and two electric switches connected to said chair by means of wires, tied to its rear legs, one of them labeled Porto Rico Railway Light & Power Co., and the other Mayagüez Light, one can only reach the conclusion that the caricature is an illustration of what the article says, more so when one reads at the foot of the caricature the phrase: "The two powerful reasons which are causing the sabotage."

Section 253, *supra*, does not create any privilege with respect to caricatures and therefore Section 249 above cited is not applicable. Section 253 does not require that a caricature be published maliciously. It only declares unlawful its publication if it should "in any manner reflect upon the *honor, integrity, manhood, virtue, reputation or business or political motives* of the person so caricatured, or *tend* to expose the individual so caricatured to public hatred, ridicule or contempt." The first error assigned must be dismissed.

■ Appellants argue the second and third errors jointly. They have to do with the evidence, which we have examined carefully as it appears from the transcript, and we are fully convinced that said evidence, when believed by the lower court, was sufficient to uphold the conviction of

the defendants. It is not alleged that the trial judge was moved by bias, prejudice or partiality and, as no manifest error has been committed in the weighing of the evidence, the judgment cannot be reversed because of the second assignment of error. With respect to the allegation that the lower court erred in holding that the defendants had not proved the truthfulness of the libelous article, what the evidence of the defendants tended to prove was that prior to the publication of the article and the caricature which gave rise to these actions, the magazine *Florete* carried out an intensive campaign in favor of the insularization of all the hydroelectric plants in the Island and objected to the Legislature of Puerto Rico's approval of a bill which tended, according to said newspaper, to benefit the Puerto Rico Railway Light & Power Co. and to work against the interests of the Water Power Authority of Puerto Rico. This campaign was carried on by *Florete* in the issues from April 2, 1938 to August 13 of the same year. Neither the articles published nor the parol evidence offered at the trial tend to prove even remotely the truthfulness of the charges made by the defendant Antonio Pacheco Padró in his article published in the August 20, 1938, issue, nor do they establish any motives which could justify Pacheco's action.

Contrary to what appellants maintain, no limitation on the constitutional right of freedom of the press is involved in these cases. The campaign which the magazine *Florete* carried out during several months shows that as long as proper use was made of this right, nobody was accused. What the Constitution of the United States and the Organic Act of Puerto Rico guarantee is the proper use, and not the abuse of this right. The constitutional rights of private individuals are as sacred as the freedom of the press and the fact that the complainant in this case was a legislator does not deprive him of his right not to be maliciously defamed. Journalists enjoy the privilege granted to them by Section 249 of the Penal Code, but if they overstep said

privilege, they cannot seek protection under the broader privilege of freedom of the press. The press can and must be free without resorting to malice, scandal or defamation, and the constitutional guarantee aforementioned does not constitute a defense when libel is committed.

In 1904 in the case of *Ex Parte Bird,* 5 P.R.R. (Second edition) 241, 246, this Court, while discussing the freedom of speech and of the press guaranteed by the First Amendment to the Constitution of the United States, expressed itself, through Mr. Justice MacLeary, as follows:

"It is confidently believed that no one, under these provisions of the Constitution, even if it should be held to be in force on this Island, could claim that he was thereby licensed to print *any and everything which he might choose to publish in regard to persons or officers, or judges or courts in their public or private relations.*

"*In other words, it is the liberty of the press, and not unbounded license, that is intended to be protected by this provision of the Constitution* " (Italics supplied.)

No other doctrine could prevail.

As the errors assigned have not been committed, the judgments appealed from must be affirmed.

ON MOTION FOR REHEARING

July 9, 1941.

The defendants appellants request that we reconsider our judgment of May 27, 1941, by which we affirmed the judgment of the lower court. In their motion of reconsideration appellants raise anew the question of the scope which must be given to the privilege granted by Section 249 of the Penal Code and insist that if the construction which we gave to said Section in our previous opinion were to prevail, the privilege of the freedom of the press granted by our Organic Act would be severely limited. They cite several paragraphs

from the well known book "Hold Your Tongue" by Morris L. Ernst and Alexander Lindey.

Although we have discussed this question of the freedom of the press in our previous opinion, it seems proper that we should add to what we there said, some additional cita-tions from other jurisdictions, so that it may be clearly seen that the decision of this Court was in strict accord with the doctrine established by the highest courts of the different states as well as by the Supreme Court of the United States.

In 11 American Jurisprudence 1113, Section 321, the doc-trine of the limitations on the freedom of the press and of speech is set forth in part as follows:

"The right or privilege of free speech and publication, guar-anteed by the Constitutions of the United States and of the several states, has its limitations. It is not an absolute right, for although limitations are recognized only in exceptional cases, the prohibition of legislation against free speech is not intended to give immunity for every use or abuse of language.

"The limitations upon the right may arise by implication, but frequently they exist by express provision of the organic law itself, for many of the state Constitutions provide in terms that responsibi-lity shall attach for abuse of the liberty or privilege so secured.

"  *       *       *       *       *       *       *

"In any event it cannot be claimed that under this right the press is free to publish, or any individual is free to utter, libels and slanders . . . ."

See to the same effect 16 C.J.S., 627, Section 213.

This question of the limitation on the freedom of the press is admirably discussed and decided in the case of *Near* v. *Minnesota*, 283 U.S. 697, 713. In this case the Legislature of the State of Minnesota approved an act by virtue of which it granted certain officials the power to suppress newspapers engaged in the publication of scandalous and defamatory matter, under the theory that they are a public nuisance. When the case reached the Supreme Court of the United States on appeal, the Court held that said legislation was

unconstitutional because it violated the freedom of the press, and expressed itself, in a brilliant opinion by Mr. Chief Justice Hughes, as follows:

"If we cut through mere details of procedure, the operation and effect of the statute in substance is that public authorities may bring the owner or publisher of a newspaper or periodical before a judge upon a charge of conducting a business of publishing scandalous and defamatory matter—in particular that the matter consists of charges against public officers of official dereliction—and unless the owner or publisher is able and disposed to bring competent evidence to satisfy the judge that the charges are true and are published with good motives and for justifiable ends, his newspaper or periodical is suppressed and further publication is made punishable as a contempt. This is of the essence of censorship.

"The question is whether a statute authorizing such proceedings in restraint of publication is consistent with the conception of the liberty of the press as historically conceived and guaranteed. In determining the extent of the constitutional protection, it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication. The struggle in England directed against the legislative power of the licenser, resulted in renunciation of the censorship of the press. The liberty deemed to be established was thus described by Blackstone: 'The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publication, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous or illegal, he must take the consequence of his own temerity.' 4 Bl. Com. 151, 152; see Story on the Constitution, Sections, 1884, 1889. The distinction was early pointed out between the extent of the freedom with respect to censorship under our constitutional system and that enjoyed in England. Here, as Madison said, 'the great and essential rights of the people are secured against legislative as well as against executive ambition. They are secured, not by laws paramount to prerogative, but by constitutions paramount to laws. This security of the freedom of the press requires that it should be exempt not only from previous restraint by the Executive, as in Great Britain, but from legislative restraint also.' Report on the Virginia Resolutions, Madison's Works, vol. IV, p. 543. This Court said, in *Pat-*

*terson* v. *Colorado,* 205 U. S. 454, 462: 'In the first place, the main purpose of such constitutional provisions is "to prevent all such *previous restraints* upon publications as had been practiced by other governments," *and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare. Common-wealth* v. *Blanding,* 3 Pick 304, 313, 314; *Respublica* v. *Oswald,* 1 Dallas, 319, 325. The preliminary freedom extends as well to the false as to the true; the subsequent punishment may extened as well to the true as to the false. This was the law of Criminal libel apart from statute in most cases, if not in all. *Commonwealth* v. *Blanding,* ubi sup.; 4 Bl. Com. 150.'

"The criticism upon Blackstone's statement has not been because immunity from previous restraint upon publication has not been regarded as deserving of special emphasis, but chiefly because that immunity cannot be deemed to exhaust the conception of the liberty guaranteed by state and federal constitutions. The point of criticism has been 'that the mere exemption from previous restraints cannot be all that is secured by the constitutional provisions'; and that 'the liberty of the press might be rendered a mockery and a delusion, and the phrase itself a by-word, if, while every man was at liberty to publish what he pleased, the public authorities might nevertheless punish him for harmless publications.' 2 Cooley, Const. Lim., 8th ed., p. 885. *But it is recognized that punishment for the abuse of the liberty accorded to the press is essential to the protection of the public, and that the common law rules that subject the libeler to re-sponsibility for the public offense, as well as for the private injury, are not abolished by the protection extended in our constitutions. id.* pp. 883, 884. *The law of criminal libel rests upon that secure founda-tion* . . . In the present case, we have no occasion to inquire as to the permissible scope of subsequent punishment. For whatever wrong the appellant has committed or may commit, by his publications, the State appropriately affords both public and private redress by its libel laws. As has been noted, the statute in question does not deal with punishments; it provides for no punishment, except in case of contempt for violation of the court's order, but for suppression and injunction, that is, for restraint upon publication." pp. 713–715.

"The exceptional nature of its limitations places in a strong light the general conception that liberty of the press, historically con-sidered and taken up by the Federal Constitution, has meant, prin-cipally although not exclusively, immunity from previous restraints or censorship. The conception of the liberty of the press in this

country had broadened with the exigencies of the colonial period and with the efforts to secure freedom from oppressive administration. That liberty was especially cherished for the immunity it afforded from previous restraint of the publication of censure of public officers and charges of official misconduct. As was said by Chief Justice Jarker in *Commonwealth* v. *Blanding*, 3 Pick. 304, 313, with respect to the constitution of Massachusetts: 'Besides, it is well understood, and received as a commentary on this provision for the liberty of the press, that it was intended to prevent all such *previous restraints* upon publications as had been practiced by other governments, and in early times here, to stifle the efforts of patriots towards enlightening their fellow subjects upon their rights and the duties of rulers. *The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its abuse.*'" pp. 716–717.

"The fact that for approximately one hundred and fifty years there has been almost an entire absence of attempts to impose previous restraints upon publications relating to the malfeasance of public officers is significant of the deepseated conviction that such restraints would violate constitutional right. *Public officers, whose character and conduct remain open to debate and free discussion in the press, find their remedies for false accusations in actions under libel laws providing for redress and punishment, and not in proceedings to restrain the publication of newspapers and periodicals.* The general principle that the constitutional guaranty of the liberty of the press gives immunity from previous restraints has been approved in many decisions under the provisions of state constitutions.

"The importance of this immunity has not lessened. While reckless assaults upon public men, and efforts to bring obloquy upon those who are endeavoring faithfully to discharge official duties, exert a baleful influence and deserve the severest condemnation in public opinion, it cannot be said that this abuse is greater, and it is believed to be less, than that which characterized the period in which our institutions took shape. Meanwhile, the administration of government has become more complex, the opportunities for malfeasance and corruption have multiplied, crime has grown to most serious proportions, and the danger of its protection by unfaithful officials and of the impairment of the fundamental security of life and property by criminal alliances and official neglect, emphasizes the primary need of a vigilant and courageous press, especially in great cities. The fact that the liberty of the press may be abused by miscreant purveyors of scandal does not make any the less necessary the immunity

of the press from previous restraint in dealing with official misconduct. *Subsequent punishment for such abuses as may exist is the appropriate remedy, consistent which constitutional privilege."* pp. 718–720.

We cannot add anything more to that set forth in this opinion by the highest Court in the land. The privilege of freedom of the press means that previous restraints cannot be imposed on the press for the purpose of preventing it from publishing what it pleases, and that censorship cannot be tolerated in a democratic government like ours. This does not mean, however, that the legislature does not have the power to restrain said privilege in appropriate cases, as was done in this jurisdiction by virtue of Section 249 of the Penal Code, and if the journalist violates said privilege he is subject, as the court held in the case of *Near* v. *Minnesota, supra,* to the corresponding action for libel.

We do not find in the motion for reconsideration presented by the appellants anything which persuades us to vary the conclusion which we reached in our judgment rendered in this case and as a result, said motion is denied.